**In the Matter of the WELFARE OF D.T.N.**

**No. C5-93-608.**

Court of Appeals of Minnesota.

Nov. 23, 1993.

Review Denied Jan. 14, 1994.

William Gatton, Legal Rights Center, Inc., Minneapolis, for appellant D.T.N.

Tom Foley, Ramsey County Atty., Darrell C. Hill, Asst. County Atty., St. Paul, for respondent county.

Considered and decided by KLAPHAKE, P.J., and HUSPENI and SCHUMACHER, JJ.

## OPINION

HUSPENI, Judge.

Appellant D.T.N., a juvenile, was charged with three counts of murder in the second degree, Minn.Stat. §§ 609.19(2), 609.05, 609.-11. After a hearing, the court granted the state's reference motion and D.T.N. appeals. Because we find no error in the district court's multifactor analysis under Minn. R.Juv.P. 32.05, subd. 2, nor in its consideration of police reports and the exclusion of appellant briefly from the reference hearing, we affirm.

## FACTS

On October 26, 1992, D.T.N. and four friends left school during sixth hour to pick up another friend at the police station. D.T.N. was driving his mother's car, and after picking up the friend, he drove to Wilder Recreation Center, where the group played football for about an hour. Two other

friends joined the game while they were there.

During their game a car containing three males and a female stopped at the playground. These individuals left their car and tried to enter the basketball building, but it was locked. They left the area but then returned, making gang signs with their hands while they passed in their car. Two of the boys in D.T.N.'s group identified the males in the car as members of a gang and asked if anyone had a gun. One of D.T.N.'s friends asked him to get a gun from his car. D.T.N. retrieved the weapon, which belonged to his cousin, and returned to the football field.

The males in the car got out and started walking towards D.T.N.'s group, saying "What's up?" They displayed no weapons, but one of D.T.N.'s friends understood their question to be an invitation to fight. D.T.N.'s cousin told him to give him the gun; he then grabbed it from D.T.N. The cousin started waving the gun and it went off, striking Roger Phillips, one of the males walking toward D.T.N.'s group. The cousin fired two more shots into the air until the other members of the group returned to their car and drove away.

D.T.N.'s group believed Phillips was feigning injury, and they left the recreation center. Later that evening they learned that Phillips died. D.T.N. and his cousin were arrested for Phillips' death.

D.T.N. was seventeen years old at the time of the incident. At the time of his arrest he lived with his mother, three brothers, and a sister. His parents were divorced and his father suffered from mental illness. D.T.N., as the oldest child, assumed significant responsibility for his younger siblings. Until September 1992, D.T.N. had excellent grades in school. At that time, however, he transferred schools and his academic performance declined severely as he began to skip school and miss assignments. D.T.N. had no disciplinary problems in school, however, and had no previous record of delinquency until October 18, 1992, when he was arrested for tampering with a motor vehicle and theft. Those charges were not adjudicated.

The reference study conducted in D.T.N.'s case recommended referral to adult court because of the limited time available to him under juvenile court jurisdiction and because of the limited treatment facilities available within the juvenile system to meet his needs for rehabilitation. One preparer of the study testified that D.T.N. would require a residential program lasting more than one year and a period of probationary supervision in the community after completing the program. Others testified that he would need between five and ten years for rehabilitation. At the time of the hearing, D.T.N. had only fourteen months remaining in the juvenile system.

Furthermore, testimony revealed that while there were two programs within the juvenile system that could accept D.T.N., one was inadequate for him because it lacked on-site psychological services and the other had an average stay of eighteen months. This would exceed the time remaining to D.T.N. in the juvenile system and would leave no time for aftercare.

The reference study also indicated that public safety would not be served by retaining D.T.N. in the juvenile system. The preparers of the study viewed D.T.N.'s role in the incident as demonstrating a disregard for the safety of others and they were concerned about D.T.N.'s lack of awareness that allowing the gun to be kept in his car would be dangerous.

The psychologist who conducted the court-ordered evaluation of D.T.N. administered nine psychological tests, evaluated information provided by the court, and interviewed D.T.N. He testified that D.T.N. was not treatable within the juvenile system owing to time restraints, stating that D.T.N. would need two to two-and-a-half years of treatment.

During the psychologist's testimony, the court excluded from the courtroom D.T.N. and everyone else except the attorneys and the court while D.T.N.'s attorney cross-examined the psychologist about D.T.N.'s Rorschach test results. The psychologist objected to testifying about the Rorschach because he was concerned that producing the cards in open court would affect adversely the integrity of the test.

D.T.N.'s witnesses at the reference hearing all recommended that he be retained in

the juvenile system. A psychologist testified that D.T.N. was amenable to treatment within the juvenile system and that he did not pose a threat to public safety. Others also testified that he was amenable to treatment and characterized him as well-behaved, a model student, and a loyal and trustworthy friend.

Based on the evidence presented at the hearing, the court granted the motion for reference, finding that the state proved by clear and convincing evidence that D.T.N. was not amenable to treatment in the juvenile court system and that public safety would not be served under the laws relating to juvenile court.

## ISSUES

1. Did the district court abuse its discretion in referring D.T.N. for prosecution as an adult by considering D.T.N.'s age and the severity of the offense?

2. Did the district court erroneously consider evidence not contained in the record when it referred to police reports concerning nonadjudicated matters that related to D.T.N.?

3. Did the district court violate D.T.N.'s constitutional rights by excluding him from a portion of the reference hearing?

## ANALYSIS

### I.

■ An adult reference order will not be reversed unless its findings are clearly erroneous so as to constitute an abuse of discretion. *In re Welfare of J.L.B.*, 435 N.W.2d 595, 598 (Minn.App.1989), *pet. for rev. denied* (Minn. Mar. 17, 1989). A court may refer a juvenile for adult prosecution only if it finds probable cause to believe that the child committed the offense, and there is clear and convincing evidence that the child is not suitable to treatment or public safety is not served by such treatment within the juvenile justice system. Minn.Stat. § 260.125, subd. 2(d)(1), (2) (1992). The district court found probable cause and found that the state established a prima facie case for reference because D.T.N. was at least 16 years old at the time of the alleged offense, was alleged by delinquency petition to have committed an aggravated felony against a person, and at the time of the offense used a firearm.[1] Minn.Stat. § 260.125, subd. 3(1)(c) (1992).

■ The district court also found, however, that D.T.N. rebutted the prima facie case by sufficient evidence. When this occurs, the court must consider the totality of the circumstances in order to determine the issues of amenability to treatment and public safety.[2] *In re Welfare of T.R.C.*, 398 N.W.2d 662, 665 (Minn.App.1987). The court must decide the issue on the basis of the entire record without reference to the prima facie case. *In re Welfare of D.F.B.*, 433 N.W.2d 79, 81 (Minn.1988). We find no abuse of discretion in the district court's determination in this case that D.T.N. be referred for prosecution as an adult.

1. Under the statute, "used" includes "brandishing, displaying, threatening with, or otherwise employing" a firearm. Minn.Stat. § 260.125, subd. 3(1)(c) (1992).

2. Eleven factors are relevant in making this determination:
 (a) the seriousness of the offense in terms of community protection,
 (b) the circumstances surrounding the offense,
 (c) whether the offense was committed in an aggressive, violent, premeditated or willful manner,
 (d) whether the offense was directed against persons or property, the greater weight being given to an offense against persons, especially if personal injury resulted,
 (e) the reasonably foreseeable consequences of the act,
 (f) the absence of adequate protective and security facilities available to the juvenile treatment system,
 (g) the sophistication and maturity of the child as determined by consideration of the child's home, environmental situation, emotional attitude and pattern of living,
 (h) the record and previous history of the child,
 (i) whether the child acted with particular cruelty or disregard for the life or safety of another,
 (j) whether the offense involved a high degree of sophistication or planning by the child, and
 (k) whether there is sufficient time available before the child reaches age nineteen to provide appropriate treatment and control.
 Minn.R.Juv.P. 32.05, subd. 2.

In making findings on each of the factors set forth in rule 32.05, subdivision 2, the district court found that the following factors favored reference: the seriousness of the offense, the fact that it was committed against a person, the fact that D.T.N. reasonably could have foreseen that carrying a gun in his car might result in personal injury, the fact that D.T.N. willingly retrieved the gun from the car when requested to do so, and the fact that several witnesses testified that there was insufficient time before D.T.N. reached age 19 to provide him with appropriate treatment and control.

The district court found that the following factors favored retention of D.T.N. in the juvenile system: the fact that D.T.N.'s role in the offense did not appear to be committed in an aggressive, violent, premeditated or willful manner; D.T.N.'s sophistication and maturity; D.T.N.'s records and previous history; and the fact that the offense did not entail a high degree of sophistication or planning.

D.T.N. insists, however, that the court's findings show neither that he is unamenable to treatment nor that he is a threat to public safety. Furthermore, he states that the court improperly referred him for adult prosecution solely because of his age and the seriousness of the offense. We will examine each of these claims.

**A. Amenability to treatment.**

■ The determination that a juvenile is not amenable to treatment in the juvenile system must be based on psychological data or a history of misconduct as well as the juvenile's age, level of maturity, and the seriousness of the offense. *In re Welfare of R.D.W.*, 407 N.W.2d 113, 117 (Minn.App. 1987), *pet. for rev. denied* (Minn. July 15, 1987). D.T.N. argues that he has neither the history of misconduct nor the psychological profile that would support a conclusion that he is not amenable to treatment. We disagree.

■ It is true that D.T.N.'s only contact with the juvenile justice system prior to this offense was his arrest for motor vehicle tampering, theft, and receiving stolen property,

and that these offenses were never adjudicated in the juvenile court. We do not require a lengthy history of contact with the juvenile justice system, however, in order to affirm a district court's reference order. *See, e.g., In re Welfare of J.A.R.*, 408 N.W.2d 692, 693 (Minn.App.1987) (appellant's previous contact with juvenile court system resulted in adjudications for incorrigibility and lurking with intent to commit a crime), *pet. for rev. denied* (Minn. Aug. 26, 1987); *T.R.C.*, 398 N.W.2d at 644 (reference affirmed where appellant's history of misconduct consisted of a period of probation for unauthorized use of a motor vehicle and shoplifting, an adjudication for driving while intoxicated, and a gross misdemeanor charge of driving while intoxicated); *In re Welfare of D.M.*, 373 N.W.2d 845, 847 (Minn.App.1985) (appellant's previous juvenile court record consisted of one adjudication for truancy).

D.T.N. argues that his background has been exemplary and that there is no evidence that he is a chronic offender. We recognize that D.T.N. has not been a discipline problem in school and that he was a model resident at the Ramsey County Juvenile Detention Center. Although he was an excellent student before fall 1992, his academic performance declined significantly during that fall, when he earned C's and D's, failed two courses, and was absent frequently.

■ The court-ordered psychological study revealed concern about D.T.N.'s sudden academic decline and his association with people regularly involved in criminal activity. Testimony at the hearing, the reference report, and the psychological evaluation all demonstrate concern for D.T.N.'s rapid and substantial behavioral and academic decline. The psychologist who evaluated D.T.N. also stated his concern about the impact of appellant's family on his mental health and the risk factor of having a schizophrenic father. According to the psychologist, D.T.N. needs psychological treatment in a structured program followed by a period of supervision once he returns to the community, which would take more time than D.T.N. has left in the juvenile system. D.T.N. argues that his psychologist, who believed D.T.N. was amenable to treatment, was a more credible wit-

ness than were those who recommended reference. Credibility determinations, however, are for the district court. We find no clear error. *See* Minn.R.Civ.P. 52.01.

D.T.N.'s argument that the district court's disposition penalizes him because of the perceived condition of his family also is without merit, and his reliance on *In re Welfare of L.K.W.*, 372 N.W.2d 392 (Minn.App.1985) is misplaced. *L.K.W.* concerned a delinquent child who violated the terms of her probation by choosing to stay solely with her father rather than alternating stays with her father and mother, who were separated. This court refused to use sanctions against L.K.W. as a means to resolve the parents' custody dispute. *Id.* at 398. In this case, however, D.T.N.'s family and home environment is one of the factors the court should use in deciding whether to refer for prosecution as an adult. *See* Minn.R.Juv.P. 32.05, subd. 2(g) (1992).

### B. Public safety.

■ In addition to finding that D.T.N. was unamenable to treatment in the juvenile court system, the district court found that there was insufficient time to treat D.T.N. in juvenile court and thus public safety will not be served if jurisdiction remains in juvenile court. Before a juvenile can be referred for prosecution as an adult, the record must contain direct evidence of dangerousness in addition to the inferences which may be drawn from the commission of the offense itself. *In re Welfare of K.P.H.*, 289 N.W.2d 722, 725 (Minn.1980).

■ While several witnesses expressed concern about D.T.N.'s recent association with individuals who were likely to engage in violent confrontations, concern about D.T.N.'s future conduct does not, we believe, meet the requirement that there be evidence of dangerousness beyond that exhibited in the offense.

Even if we assume, however, that the record does not support a finding that D.T.N. is a threat to public safety, the district court's reference order may be affirmed. The evidence need only show either that the juvenile is not amenable to treatment *or* that public

safety is not served under the provisions of the laws relating to juvenile courts. Minn. Stat. § 260.125, subd. 2(d)(2). There is no requirement that both unamenability and public safety requirements be met.

### C. The impact of D.T.N.'s age and the seriousness of the offense.

■ Evidence on the age of the offender and the offense, by itself, does not establish cause for reference. *In re Welfare of T.L.C.*, 435 N.W.2d 581, 583 (Minn.App.1989). D.T.N. claims that the district court erred because it emphasized these factors in its written memorandum accompanying the reference order. We find no error. The fact that D.T.N.'s age and the seriousness of the offense are two of the factors that point towards reference in a multi-factor analysis does not invalidate the district court's decision. The court made commendably full and specific findings on the eleven factors set forth in rule 32.05, subdivision 2.

Despite our determination that the district court did not abuse its discretion in referring D.T.N. for adult prosecution, we cannot ignore a note of irony. Because of D.T.N.'s age and his particular treatment needs, he is referred for adult prosecution, while the person who actually shot the victim will remain in juvenile court. Furthermore, we are unable to assure that if D.T.N. is convicted in adult court he will receive the treatment he needs. These concerns, however, cannot be adequately addressed by this court, given our narrow standard of review. The public policy issues embodied in these concerns are more appropriately addressed by the legislative branch of government.

### II.

■ D.T.N. claims that because a statement he made to a deputy sheriff when arrested for motor vehicle tampering, theft, and receiving stolen property was not received in evidence at the reference hearing, the district court committed reversible error by considering it in making its decision. The rules applicable to juvenile reference hearings do not limit the evidence to that "admissible in a criminal trial." *In re Welfare of T.L.J.*, 495 N.W.2d 237, 240 (Minn.App.1993).

*See* Minn.R.Juv.P. 32.04; *cf.* Minn.R.Juv.P. 27.04 (when attempting to prove the allegations of the petition, the court shall admit only such evidence as would be admissible in a criminal trial). A leading commentary on juvenile practice indicates that the hearsay rule should be liberally interpreted in reference hearings. 12 John O. Sonsteng and Robert Scott, *Minnesota Practice* 508 (1985). Further, this court has recognized that the hearsay rule should not be strictly applied to exclude police reports from reference hearings. *T.L.J.*, 495 N.W.2d at 240.

The police reports in this case were submitted to the district court and are in the district court file. Although not produced as an exhibit at the reference hearing, these reports were mentioned in the reference study and were the subject of testimony at the hearing.

 The reference hearing is not a trial to adjudicate the juvenile's innocence or guilt. As we noted in *In re Welfare of E.Y.W.*, 496 N.W.2d 847 (Minn.App.1993), *pet. for rev. denied* (Minn. Apr. 20, 1993), the appellant is still free to challenge the admissibility of evidence if an adult trial is warranted. *Id.* at 850.

 Finally, the police reports could be judicially noticed because they are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Minn.R.Evid. 201(b)(2). In *In re Welfare of Clausen*, 289 N.W.2d 153 (Minn.1980), the Minnesota Supreme Court held that a court could take judicial notice of files and records from its juvenile and criminal divisions and that doing so served the function of judicial notice to expedite litigation by eliminating the cost or delay of proving readily verifiable facts. *Id.* at 156–57. Thus the district court did not abuse its discretion in considering the police reports when it made its decision to refer D.T.N. for adult prosecution.

### III.

D.T.N. argues that the district court violated his constitutional rights by excluding him from the courtroom when the psychologist refused to testify in open court regarding D.T.N.'s responses for each Rorschach inkblot and his interpretation of those responses. The psychologist believed that testifying would affect the integrity of the test if people in general knew how the inkblots were interpreted. The district court questioned the test's probative value in this case, but permitted D.T.N.'s attorney to cross-examine the psychologist in front of the state's attorney, the court, and the court reporter only. At the end of the Rorschach testimony, the court readmitted D.T.N. and others to the courtroom.

 The harmless error standard of review applies to errors involving constitutional rights. *State v. Robinson*, 427 N.W.2d 217, 224 (Minn.1988). In order to obtain relief on appeal, a party generally must establish prejudice as a result of a tribunal's actions. *Petition of Otter Tail Power Co.*, 417 N.W.2d 677, 679–80 (Minn.App.1988), *pet. for rev. denied* (Minn. Mar. 23, 1988). A reviewing court will not reverse a trial court for an error that it can see did not change the result. *Miller v. Hughes*, 259 Minn. 53, 62, 105 N.W.2d 693, 699 (1960).

 The rules of juvenile procedure provide that a child has the right to be present at all hearings. Minn.R.Juv.P. 7.02, subd. 1. Rule 30.04, however, states that disposition hearings shall be conducted in an informal manner. Minn.R.Juv.P. 30.04, subd. 1. While the informal nature of reference hearings does not mean that participants may be deprived of due process rights, neither are they entitled to the full panoply of trial rights. *In re Welfare of T.D.S.*, 289 N.W.2d 137, 141 (Minn.1980).

 We follow *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), and *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), in defining a juvenile's due process rights during a reference hearing. In interpreting a District of Columbia juvenile reference statute, the *Kent* Court stated that a juvenile is entitled to a hearing, representation by counsel, access to records and reports considered by the court, and a statement of reasons for the court's decision. *Id.* 383 U.S. at 557, 561–63, 86 S.Ct. at 1055, 1057–58. The *Gault* court

raised these principles to constitutional stature. *Gault,* 387 U.S. at 30–31, 87 S.Ct. at 1445. Neither *Kent* nor *Gault* requires application of the right of confrontation at reference proceedings. *T.D.S.,* 289 N.W.2d at 140. Since there is no adjudication of guilt or innocence at the reference proceeding, there is no need to apply the full range of trial rights. *Id.* at 141. Thus, in this case, D.T.N.'s constitutional right to be present at all critical stages is not as strong as it would be in the trial itself.

 D.T.N. produced no evidence of prejudice from his brief exclusion from the room, other than to state, "it is impossible to determine what contribution or assistance to counsel appellant could have rendered had he been present." We believe that D.T.N.'s attorney could have requested a brief recess to consult with D.T.N. if the psychologist's testimony warranted D.T.N.'s assistance. The attorney did not do so, nor did he attempt to challenge the psychologist's interpretations through the testimony of D.T.N.'s own psychologist.

D.T.N.'s brief absence from the courtroom does not appear to have changed the outcome of the reference hearing. Rather, there is sufficient evidence in the record to support the court's determination under the totality of the circumstances that the county attorney met his burden to demonstrate that D.T.N. should be referred to adult court. We find that the court's exclusion of D.T.N. from the courtroom did not constitute reversible error.

### DECISION

The district court did not abuse its discretion in referring D.T.N. for adult prosecution or in considering police reports that were in the court file. D.T.N.'s brief exclusion from the courtroom during the reference hearing did not constitute reversible error.

**Affirmed.**