**In the Matter of the WELFARE OF M.J.B.**

No. C7-93-1260.

Court of Appeals of Minnesota.

Dec. 21, 1993.

Review Denied Feb. 24, 1994.

John M. Stuart, State Public Defender, Charlann E. Winking, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey III, Atty. Gen., Saint Paul, Alan Mitchell, St. Louis County Atty., Duluth, Gordon P. Coldagelli, Asst. County Atty., Virginia, for respondent.

Considered and decided by KALITOWSKI, P.J., and RANDALL and DAVIES, JJ.

## OPINION

DAVIES, Judge.

Juvenile M.J.B. appeals from an order referring him for adult prosecution on charges of aggravated robbery, burglary, and first degree murder. In referring M.J.B., the juvenile court found that the state had provided clear and convincing evidence that inadequate time remained to treat M.J.B. before his 19th birthday, that M.J.B. was, therefore, unlikely to succeed in the juvenile treatment system, and that retaining M.J.B. in the juvenile system would not protect the public safety. We affirm.

## FACTS

On January 28, 1992, when M.J.B. was 15 years and 5 months old, he met with C.J.B., a somewhat older friend. The two boys formulated a plan to rob Edwin Santi to obtain Santi's pickup truck and cash so that C.J.B. could leave the state. Santi was 60 years old, had severe arthritis, and was unable to walk without the assistance of two canes. Both boys had worked on Santi's farm and were familiar with the farm's layout and Santi's physical limitations.

That night, the boys brought a baseball bat with them and forcibly entered Santi's home. C.J.B. admits to hitting Santi quite a few times with the bat while M.J.B. rummaged through Santi's bedroom looking for cash. C.J.B. admits to striking all of the numerous blows, but alleged that M.J.B. at one point said, "He's still moving; hit him again!" M.J.B. denies making that statement or participating in the actual beating.

After finding only $11, the two boys left in Santi's truck. They headed south, stealing gas along the way. Around 7:15 p.m. the next day, M.J.B. called his mother from Topeka, Kansas, and told her he was in big trouble. M.J.B. also inquired about Santi's condition. M.J.B.'s mother encouraged him to turn himself in. About 45 minutes later, M.J.B. surrendered to Topeka authorities. A short time later, Topeka police arrested C.J.B. in the stolen vehicle. Santi died two weeks later without regaining consciousness. M.J.B. was charged with aggravated robbery, burglary, and first degree murder.

Drs. Ham and Hoffman testified at the reference hearing. They agreed that juvenile treatment programs were available for M.J.B., but Dr. Ham, the court-appointed psychologist, opined that the prognosis for changing M.J.B.'s behavior was poor to guarded. Dr. Hoffman, M.J.B.'s expert psychologist, believed that M.J.B. could be successfully treated within two years and that the public safety would be adequately served if M.J.B. were confined to a secure facility for that period. Dr. Hoffman conceded that in the past M.J.B. had had bouts of violent behavior, but added that he did not consider M.J.B. to be a violent individual.

After weighing all the testimony, the court determined that the state had provided clear and convincing evidence that the juvenile system was "unable to provide appropriate treatment, and that the public safety [would] not be served by retaining jurisdiction * * * in the Juvenile Court." The juvenile court's memorandum contains 70 findings of fact. Most significantly, the court stated that M.J.B. had acted with "particular cruelty and disregard for the life and safety of Edwin Santi." Further, the court found that strong evidence demonstrated that M.J.B. had had chronic behavioral problems since early childhood, that M.J.B. had not benefitted from the considerable therapy that he had received from an early age both as an outpatient and in a residential treatment facility, and that M.J.B. had met with his therapist as late as two days before the offense. The

court noted that, although M.J.B. responded well to structured settings, he had not evinced any lasting effect from treatment, and, once out of a structured setting, would resort to his deep-rooted behavioral problems of lying and aggression.

## ISSUE

Did the trial court err in finding that the state had produced clear and convincing evidence to refer this 15–year–old juvenile as an adult?

## ANALYSIS

■ A juvenile reference order will not be reversed unless its findings are clearly erroneous so as to constitute an abuse of discretion. *In re Welfare of J.L.B.,* 435 N.W.2d 595, 598 (Minn.App.1989), *pet. for rev. denied* (Minn. Mar. 17, 1989).

In 1980, the legislature amended the juvenile reference statute

> to promote the public safety and reduce juvenile delinquency by maintaining the integrity of the substantive law prohibiting certain behavior and by developing individual responsibility for lawful behavior.

1980 Minn.Laws ch. 580, § 3 (codified at Minn.Stat. § 260.011, subd. 2(c) (1992)).

To refer a child for adult prosecution, the trial court must find (1) probable cause "to believe the child committed the offense alleged by [the] delinquency petition;" and (2) a demonstration by "clear and convincing evidence that the child is not suitable to treatment or that the public safety is not served under the provisions of laws relating to juvenile courts." Minn.Stat. § 260.125, subd. 2(d)(1)–(2) (1992); *accord* Minn. R.Juv.P. 32.05.

■ Where a prima facie case for referral has not been made, the court must examine the totality of the circumstances. Minn. R.Juv.P. 32.05.[1] Totality of the circumstances includes but is not limited to

(a) the seriousness of the offense in terms of community protection,

(b) the circumstances surrounding the offense,

(c) whether the offense was committed in an aggressive, violent, premeditated or willful manner,

(d) whether the offense was directed against persons or property, the greater weight being given to an offense against persons, especially if personal injury resulted,

(e) the reasonably foreseeable consequences of the act,

(f) the absence of adequate protective and security facilities available to the juvenile treatment system,

(g) the sophistication and maturity of the child as determined by consideration of the child's home, environmental situation, emotional attitude and pattern of living,

(h) the record and previous history of the child,

(i) whether the child acted with particular cruelty or disregard for the life or safety of another,

(j) whether the offense involved a high degree of sophistication or planning by the child, and

(k) whether there is sufficient time available before the child reaches age nineteen (19) to provide appropriate treatment and control.

*Id.* While a court may consider these factors, the rules do not mandate what weight a court must assign to each. *In re Welfare of K.J.K.,* 357 N.W.2d 117, 120 (Minn.App.1984).

■ Most significantly, the juvenile court found that M.J.B. suffers from a mixed conduct disorder and exhibits borderline personality traits. While M.J.B. has responded favorably to past treatment, M.J.B.'s problems with lying, minimizing his own responsibility for his actions, and aggressive behavior were characterized by Dr. Hoffman as chronic, enduring facets of his personality. The court reasoned that, because of the chronic nature of M.J.B.'s problems, insufficient time was available to provide appropriate treatment and control. *See, e.g., In re Welfare of D.F.B.,* 433 N.W.2d 79, 81–82 (Minn.1988)

---

1. A statutory prima facie case for reference is provided in Minn.Stat. § 260.125, subd. 3 (1992).

Because M.J.B. was less than 16 at the time of the offense, he does not fit that provision.

(trial court may properly consider likelihood of juvenile's successful treatment as one factor).

█ Although one psychologist indicated that juvenile treatment programs were available and that M.J.B. would be better served in the juvenile system, the court determined that clear and convincing evidence also established that community safety would be threatened by his release at age 19. *See, e.g., In re Welfare of D.T.N.*, 508 N.W.2d 790 (Minn.App.1993); *In re Welfare of J.L.B.*, 435 N.W.2d 595, 601 (Minn.App.1989) (Crippen, J., dissenting) (where record contains adequate evidence of dangerousness, reference may be necessary for the public's interest). The court found that the two boys had planned the robbery, taken advantage of a severely handicapped individual, and committed the offense "in an aggressive, violent, premeditated, and wilful manner." Moreover, M.J.B. had ample opportunity to withdraw from the scheme, to prevent C.J.B. from continuing the act, and to provide aid to Santi afterward.

From these facts and from the experts' testimony, the court reasonably concluded that M.J.B.—once out of a structured treatment system—was a high risk to reoffend. Further, the court determined that the time remaining before M.J.B.'s 19th birthday was insufficient for treatment within the juvenile system. In the interest of public safety, the court properly referred M.J.B. for adult prosecution.

## DECISION

The juvenile court did not abuse its discretion in finding that M.J.B. was not amenable to effective treatment before turning 19 and that his retention in the juvenile system would not serve the public's interest.

**The juvenile court's reference order is affirmed.**

RANDALL, Judge (concurring specially).

I concur in the result. I do find a sufficient record, not overwhelming, but sufficient, to affirm the discretionary decision of a trial court judge to certify a juvenile for adult prosecution. The problem is that for all practical purposes, certification is virtually predestined, regardless of the facts, for most juveniles the closer they come to their 18th birthday for any crime involving any element of danger or anti-social behavior. The artificially short jurisdiction given to the juvenile court drives the certification process from behind the scene. If a juvenile is not certified to the adult system, on midnight of the day he turns 19, it is over, he is sprung free, that is it folks, no more control. In the knowledgeable trial judge's mind, that fact is ever present.

From experience we know that between the initial crime and the last of the appellate process, it may take several months to over a year to decide certification. Between the crime and the hearing on the motion to certify, there may be several days to several weeks needed for adequate preparation. If there is an appeal to this court, even with our expedited process, it routinely takes at least 60 to 90 days for the parties to complete research and submit briefs. Once the case is presented to this court, it will likely be another 50 to 90 days (about the fastest track of any intermediate court of appeals in the country) before our decision is released. Then both parties have up to 30 days to decide whether to petition the Minnesota Supreme Court for review of our decision. If a party petitions for further review, the supreme accept review, then preparation, briefing, argument, deliberation, and opinion writing will take more time. Thus, by the time a decision not to certify is finally in place, the amount of "control time" the juvenile court has left over the individual may be less than a year, may be down to several weeks, and in some instances may be just days or may have become moot (the case of a juvenile approaching his 19th birthday by the time his fight to avoid certification is complete). *This is always a factor weighing against the juvenile fighting certification.*

Where an offense is committed around the time of a juvenile's 16th birthday, the time needed for the prosecution and the defense to adequately prepare for certification, and the time needed to exhaust all appellate avenues, may leave less than two years, often even less than one year for the juvenile who

successfully resisted certification. Even when the juvenile offender is admittedly amenable to treatment in the juvenile system, there are competent experts who agree that amenability is conditioned on reasonable treatment, and that a matter of several months may be too short for reasonable treatment. This time compression produces the no-win situation we see so often. The juvenile who successfully fights off certification is left without enough time for adequate treatment. The juvenile who loses the fight against certification, partly because the trial judge knows of the too-short time limits, now faces up to thirty years (depending on the crime) hard time in an adult prison. This is true even if lengthy juvenile treatment would have been the answer, both for the juvenile and for the safety of society.

> Even with thoughtful, compassionate trial judges attempting to follow the letter and the spirit of the law on certification, the practical knowledge that treatment in the juvenile system ends within a matter of a few months to a few years at best, has to impermissibly weigh on the side of certification even [where, as here,] amenability to treatment [in a juvenile setting] * * * is supported by the record.

*See In re Welfare of J.D.P.*, 439 N.W.2d 725, 730 (Minn.App.1989) (Randall, J., dissenting), *pet. for rev. denied* (Minn. June 21, 1989).

I suggest the answer lies in some reasonable extension of the time that the juvenile court can exercise control over youthful offenders. This could accomplish the twin goals of satisfying the public that juvenile offenders are handled appropriately, and handling them appropriately.