In the Matter of the WELFARE OF M.E.P., Juvenile, A.A.D., Juvenile, R.A.J., Juvenile, E.A.E., Juvenile.

Nos. C8–94–1214, CX–94–1215, C1–94–1216 and C3–94–1217.

Court of Appeals of Minnesota.

Nov. 22, 1994.

James C. Backstrom, Dakota County Atty., Charles A. Diemer, Scott A. Hersey, Asst. County Attys., Hastings, for appellant Dakota County.

Paul W. Rogosheske, South St. Paul, Susan Bates Gegen, St. Paul, guardian ad litem, for M.E.P.

Mark A. Paige, West St. Paul, for A.A.D. Dennis Patrick Moriarty, Jaspers, Moriarty & Walburg P.A., Shakopee, for R.A.J. Mark A. McDonough, McDonough, Wagner & Sherry, P.A., Apple Valley, for E.A.E.

Considered and decided by NORTON, P.J., and SCHUMACHER, and THOREEN,* JJ.

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

## OPINION

SCHUMACHER, Judge.

This is a consolidated pretrial appeal by the state from an order entered in four juvenile delinquency proceedings. The district court held a joint omnibus hearing to consider probable cause, suppression and reference motions in the four delinquency cases, which all involved juveniles charged in the same incident. We affirm in part, reverse in part, and remand.

## FACTS

The four juveniles are charged with various offenses for their involvement in the shooting death of Marc Stier on January 13, 1994. Stier and the four juveniles had been riding in Stier's Chevrolet Blazer before stopping at a gas station. The delinquency petitions allege that Stier was shot in the gas station parking lot while sitting in the rear cargo area of the Blazer, then was moved to the back seat before police arrived.

Sixteen-year-old M.E.P., who at all times admitted firing the fatal shot, was charged in a delinquency petition with first degree murder. Sixteen-year-old A.A.D., who was sitting in the back seat of the Blazer next to M.E.P. when the shot was fired, was charged with aiding and abetting an offender. Seventeen-year-old E.A.E., who was sitting in the front passenger seat, was charged with the same offense. Seventeen-year-old R.A.J., who allegedly taunted M.E.P. into shooting Stier, was charged as an accomplice with first degree murder.

The juveniles told police that the five of them had driven around that afternoon, stopping once at Stier's house, and smoking marijuana as they drove. Stier's .22 caliber handgun was in the Blazer, and two of the boys fired this gun out the window of the Blazer across some open fields. The boys drove to the gas station in Burnsville, allegedly intending to case it for a possible theft of gasoline for the vehicle.

At the gas station, M.E.P. got out of the car and went into the station, ostensibly to use the restroom. As M.E.P. was returning, R.A.J., who had been driving, also left the car and entered the station, where he bought a bottle of Mello Yello pop. Police found the bottle, unopened and with R.A.J.'s fingerprints on it, in the Blazer. The cash register tape showed this purchase was made at 3:52:37 p.m. The shooting was reported by a 911 call received at 3:55:15 p.m.

When the first police officers arrived, very shortly after the 911 call, Marc Stier's body was found in the back seat of the Blazer. Blood stains found in the rear cargo area of the Blazer, however, later convinced police that Stier had been in the rear cargo area when he was shot.

The first officer on the scene testified that when he drove up the four juveniles were standing by the passenger door of the Blazer. M.E.P. told the officer that he had shot Stier, but that it was accidental. The officer ordered the juveniles to kneel down in the parking lot. Another officer arrived, and had them lay face down on the ground. The four juveniles were handcuffed, pat searched, and placed in separate squad cars as other officers arrived. M.E.P. was given a *Miranda* warning. The others were not. The four juveniles were taken to the Burnsville Law Enforcement Center (LEC).

M.E.P. arrived at the LEC at about 4:15 p.m. He was booked and placed in an adult holding cell. At about 5:00 p.m., officers began questioning him, after giving him a *Miranda* warning. The other juveniles arrived at the LEC shortly after M.E.P. One of them, A.A.D., was also booked and taken to an adult holding cell. Another, E.A.E., was booked and placed in the LEC's only juvenile holding cell. The fourth juvenile, R.A.J., was taken to a large interview room which was not secure. Police took initial statements from the juveniles, who, except for M.E.P., were not given *Miranda* warnings.

In their first statements to police, the juveniles all said the shooting had been accidental and that Stier had been in the back seat when shot. Police notified the juveniles' parents, who began arriving at the LEC around 7:30 p.m. Several of the parents met with their children for varying lengths of time.

At about 9:00 p.m., police officers examining the Blazer discovered the blood stains in the rear cargo area. This evidence appeared to contradict the boys' account of Stier being shot while in the back seat. The detectives agreed that Stier's body must have been moved after the shooting, and that the juveniles would have to be reinterviewed. After a conference, it was decided to question A.A.D. and R.A.J. first. The parents were not told of the serious suspicions police now had, only that there were inconsistencies and that the juveniles would have to remain for further questioning. The parents of R.A.J. were in the process of leaving the building with their son when he was called back for the second interview.

At 10:25 p.m., Detective Free and Detective Adrian began questioning A.A.D., after giving him a *Miranda* warning. The officers confronted the juvenile, stating that physical evidence contradicted his account of an accidental shooting. After about 15 minutes, A.A.D. cried and blurted out that Stier had been shot while in the back cargo area of the Blazer. Detective Free testified that no promises or threats were made to A.A.D.

Detectives Raas and Boudreau began reinterviewing R.A.J. at 10:35 p.m. R.A.J. maintained he had not been in the Blazer when the shot was fired. He told the officers he was still on the way back from purchasing the Mello Yellow bottle in the gas station. As R.A.J. stuck to his original story, the interviewing officers were informed that A.A.D. had confessed, admitting the shooting was not accidental.

At 1:00 a.m., Detective Free left the A.A.D. interview and joined the others as a third officer questioning R.A.J. Detective Boudreau offered to leave, but R.A.J. declined the offer. Detective Raas told R.A.J. that Detective Free would know whether R.A.J. was lying. Free accused R.A.J. several times of lying. At about 2:00 a.m., after Detective Free had left, R.A.J. admitted being inside the car and encouraging M.E.P. to shoot Stier. R.A.J. cried "fairly hard" at this point, and Detective Raas hugged him and

consoled him. R.A.J. was given time to compose himself. A taped statement was taken beginning at 2:10 a.m.

Detective Adrian and Officer Leach began the second interview with E.A.E. at about 2:30 a.m. E.A.E. had been in a juvenile holding room, which did not have a bed. The door was not locked, although an alarm would sound if the occupant attempted to leave.

E.A.E. testified that the officers were "in his face" during the interview, standing close to him and leaning over the table. E.A.E. testified that the officers told him that A.A.D. and R.A.J. were going home and that he would be left to "take the fall" for the incident. Detective Adrian denied that either of these statements were made. He admitted that Officer Leach raised his voice once. E.A.E. was questioned until 3:25 a.m., when a taped statement was taken in which E.A.E. admitted the shooting had been intentional.

The last juvenile to be reinterviewed was M.E.P., who was awakened in his cell at about 4:30 a.m. by Detectives Free and Raas. The officers allowed M.E.P. to use the bathroom on the way to the interview room. The officers told M.E.P. the physical evidence was inconsistent with his story and that he had lied the first time. M.E.P., however, clung to his story of an accidental shooting. The officers told M.E.P. that telling the truth would be better for him. At the end of his statement, when asked if there had been any promises or threats, M.E.P. replied that the officers had promised him "[t]hat you would help me if I told the truth." The officers denied making any promises. Eventually, M.E.P. admitted the shooting was not accidental, and he began crying. Detective Raas held his hand and M.E.P. cried on his shoulder.

Dakota County filed a delinquency petition charging M.E.P. with first and second degree murder and kidnapping. The county moved to refer M.E.P. for adult prosecution. R.A.J. was also charged by delinquency petition with being an accomplice to first and second degree murder. E.A.E. and A.A.D. were charged with four counts of aiding and abetting an offender. The county dismissed its

reference motions against all the juveniles except M.E.P. after receiving unfavorable reference evaluations from its expert, Dr. Roger Carten. A.A.D. admitted to the allegations in the petition, and did not participate in the joint omnibus hearing at which the suppression motions and other issues were decided. The court later granted his motion to withdraw the admission.

At the reference portion of the hearing, Dr. Carten recommended against referring M.E.P. for adult prosecution. Dr. Carten concluded that M.E.P. has an identity disorder and is chemically dependent, but noted M.E.P. did not have a history of aggressive behavior or a significant history of juvenile delinquency. Dr. Carten concluded that M.E.P. was very remorseful, willing to be treated, and posed no threat to public safety.

Two other experts, Dr. Cronin and Dr. Gilbertson, agreed that M.E.P. could be treated in the juvenile court system and should not be referred for adult prosecution. Dr. Cronin, the defense expert, concurred in Dr. Carten's evaluation. Dr. Gilbertson, the court-appointed expert, did not agree that M.E.P. has an identity disorder but testified that M.E.P. could be treated in the juvenile system. Dr. Gilbertson testified that the characteristics of the offense were troubling but that the probability of M.E.P. engaging in another violent act was statistically remote. He expressed reservations, however, that M.E.P. could complete a year of sobriety following chemical dependency treatment and before his 19th birthday.

Dr. Philander, the state's expert at the time of the hearing, testified that the characteristics of the offense strongly favored adult reference. Dr. Philander concluded that M.E.P.'s record, including multiple drug sales and truancy, showed him to be a relatively sophisticated juvenile. Dr. Philander noted M.E.P.'s two prior incidents of assaultive behavior at school, but described his juvenile record as "relatively benign." He recommended, however, that M.E.P. be referred for adult prosecution.

The district court suppressed all of the statements the juveniles gave to police except for M.E.P.'s first statement. The court

dismissed the petition against R.A.J. for lack of probable cause. Finally, the court denied the motion to refer M.E.P. for adult prosecution, finding that M.E.P. was amenable to treatment in the juvenile system and could be treated there consistent with public safety.

### ISSUES

1. Did the trial court clearly err in suppressing the initial statements of three of the juveniles?

2. Did the trial court clearly err in suppressing the later statements of all four juveniles as involuntary?

3. Did the trial court properly consider the probable cause and suppression issues concerning A.A.D., who did not participate in the hearing?

4. Did the trial court clearly err in dismissing the petition against R.A.J. for lack of probable cause?

5. Did the trial court abuse its discretion in denying the motion to refer M.E.P. for adult prosecution?

### ANALYSIS

■ 1. The state contends that the trial court clearly erred in suppressing the initial statements of A.A.D., E.A.E. and R.A.J. *See generally State v. Joon Kyu Kim,* 398 N.W.2d 544, 547 (Minn.1987) (state in pretrial appeal must show clearly and unequivocally that the trial court erred and that the error will have critical impact on the outcome of trial). The trial court suppressed the three statements because the juveniles were not given *Miranda* warnings. The court concluded that, despite the officers' view that these three juveniles were only witnesses, there were sufficient objective indicia of police custody that a reasonable person would believe that they were under arrest. *See generally State v. Herem,* 384 N.W.2d 880, 884 n. 2 (Minn.1986) (a *Miranda* warning need be given only if a reasonable person would understand that they were not free to leave).

The state contends that the on-the-scene "felony stop" procedures were solely for the protection of the officers responding to a reported shooting, and did not signify a formal arrest. The state also argues that the three juveniles other than M.E.P. were questioned at the police station solely for the convenience of the investigation, and not because they were under arrest. But at the LEC significant restrictions were placed on the juveniles' freedom of movement.

The state cites *State v. Hogan,* 297 Minn. 430, 441, 212 N.W.2d 664, 671 (1973), in which the supreme court noted that the juvenile "was not a suspect and in fact continued to declare himself a victim" when he made his initial statement to police at the hospital. But in *Hogan,* police placed no restrictions on the juvenile, who was being treated in the emergency room. *Id.* at 432, 441, 212 N.W.2d at 666, 671. Here, each of the juveniles was handcuffed, placed in a squad car, and transported to the Burnsville LEC, where all but one were photographed, fingerprinted, and booked. One of the three juveniles was placed in a holding cell. A second was placed in a juvenile holding room. The juveniles were "being restrained to a degree associated with a formal arrest." *State v. Rosse,* 478 N.W.2d 482, 486 (Minn.1991).

■ The interviewing officers told the juveniles that they were only getting witness statements from them, or that they were not under arrest. Despite these assurances, however, two of the three juveniles were returned to a holding cell or room after their statements, and the third was clearly not free to leave without police permission. One of the factors to consider in determining whether a person is in custody during police questioning is whether he or she was placed under arrest at the end of questioning. *United States v. Griffin,* 922 F.2d 1343, 1349 (8th Cir.1990). Although the juveniles were not told they were in custody, they were returned to their places of confinement, or police restraint, after their initial interviews. The juveniles could reasonably have believed they were in police custody, and had been under arrest during their initial statements, despite assurances to the contrary. *See Stansbury v. California,* —— U.S. ——, ——, 114 S.Ct. 1526, 1528, 128 L.Ed.2d 293 (1994) (noting that officer's clear statement that

person is not a prime suspect is not dispositive); *State v. Walsh*, 495 N.W.2d 602, 605 (Minn.1993) (although officer told defendant several times he was not under arrest, reasonable person handcuffed and bound to stairway railing would have believed he was in custody).

■ There are no material factual issues regarding the custody status of the three juveniles at the time of their initial statements. Whether the juveniles were in custody so as to require a *Miranda* warning is reviewed under a clearly erroneous standard. *State v. Kelly*, 435 N.W.2d 807, 813 (Minn. 1989). We conclude that the trial court did not clearly err in determining that the juveniles were in custody, and in suppressing their statements because no *Miranda* warnings were given.

■ 2. The state contends that the trial court clearly erred in suppressing as involuntary the second statements of all the juveniles. The court must look at the totality of the circumstances in determining if a confession is voluntary. *State v. Slowinski*, 450 N.W.2d 107, 111 (Minn.1990). The factors to consider include:

> The age, maturity, intelligence, education, and experience of the defendant and the ability of the defendant to comprehend; the lack of or adequacy of warnings; the length and legality of the detention; the nature of the interrogation; whether the defendant was deprived of any physical needs; and whether the defendant was denied access to friends.

*State v. Jungbauer*, 348 N.W.2d 344, 346 (Minn.1984). The state must show by a preponderance of the evidence that the confession was voluntary. *State v. Wajda*, 296 Minn. 29, 206 N.W.2d 1 (1973). This court can make an independent determination of the voluntariness of the confession based on the record. *State v. Hoffman*, 328 N.W.2d 709, 714 (Minn.1982).

In suppressing the statements, the trial court relied heavily on the juveniles' lack of food, their restricted access to parents present in the building, the officers' failure to tape the entire interviews, and the length of the juveniles' detention. The court also not-

ed the police officers' use of psychological pressure, promises and stress-inducing techniques.

None of the juveniles had anything to eat while they were in custody at the LEC. Some of them, however, were offered food and declined it. Detective Adrian, for example, testified that he offered A.A.D. food or drink but he declined. The court in its order noted that, although the police officers had ordered food brought in for themselves at about 1:00 a.m., no food was given to the juveniles. The court did not acknowledge the police testimony that several of them had offered food to the juveniles, who had declined it.

■ Physical deprivations such as a lack of food are a factor to consider in determining the voluntariness of a confession. *See, e.g., State v. Moorman*, 505 N.W.2d 593, 600 (Minn.1993). The court in *Moorman*, however, noted that where the defendant, a diabetic, did not ask for anything to eat or drink during the five-hour interview and did not appear to be suffering from lack of food, the police did not use any lack of food "to coerce an involuntary confession." *Id.* The police here offered the juveniles food, as well as water and the use of restroom facilities. The juveniles' failure to accept these offers does not render their confessions involuntary.

■ The presence or absence of parents is one factor in the determination of the voluntariness of a juvenile's confession. *State v. Ouk*, 516 N.W.2d 180, 185 (Minn. 1994). The state notes, however, that a parent need not be present in order for a juvenile to waive his *Miranda* rights. *See, e.g., In re Welfare of L.R.B.*, 373 N.W.2d 334 (Minn.App.1985). All of the parents here were notified of their child's detention, and allowed an opportunity to talk with their child before any of the second round of interviews were held. There is no absolute requirement that parents be present during interrogation or that they be told they may be present. *See Ouk*, 516 N.W.2d at 185 (presence or absence of parents is one factor); *State v. Hogan*, 297 Minn. at 440, 212 N.W.2d at 671 (parental presence is only one

factor, not an absolute prerequisite to voluntariness).

▆ The trial court noted the police failure to record their entire conversations with the juveniles. The supreme court has recently adopted a rule that would require such recording. *State v. Scales,* 518 N.W.2d 587, 592 (Minn.1994). The *Scales* holding, however, is a prospective rule. *Id.* at 593. The trial court here may have properly considered the failure to record as one factor in its analysis. *See State v. Pilcher,* 472 N.W.2d 327, 333 (Minn.1991) (court would look with great disfavor on further refusals to record entire police interviews). But we note that three of the juveniles were not considered suspects until very late in the interviewing process, and M.E.P. was suspected only of an accidental shooting.

The trial court determined that the detention of the juveniles beyond the "6 hour rule" and the "36 hour rule" bore heavily on the voluntariness of their confessions. The "6 hour rule" provides that a juvenile is not to be detained in an adult jail for more than six hours unless a juvenile petition has been filed and a judge has approved the detention. Minn.Stat. § 260.171, subd. 2(c) (1992). The trial court apparently concluded that the adult holding cells in which A.A.D. and M.E.P. were held were an adult jail. The juvenile court apparently applied the "36 hour rule" for detention in a "juvenile secure detention facility" to the juvenile holding room in which E.A.E. was detained. *See* Minn.Stat. § 260.171, subd. 2(b).

▆ The violation of a prompt arraignment rule does not automatically require suppression of statements taken during the illegal detention. *State v. Wiberg,* 296 N.W.2d 388, 393 (Minn.1980) (rejecting rule of automatic suppression); *see also State v. Jackson,* 469 N.W.2d 457, 461 (Minn.App.1991) (following *Wiberg*), *aff'd* 472 N.W.2d 861 (Minn.1991) (addressing separate issue). The supreme court in *Wiberg* stated that, in considering the admissibility of a confession obtained during a detention in violation of a prompt arraignment rule,

the trial court should consider, among other things, how reliable the evidence is,

* * * whether the delay compounded the effects of other police misconduct, and the length of the delay.

*Wiberg,* 296 N.W.2d at 393.

▆ The confessions of the four juveniles appear to be very reliable, because they are highly consistent with each other and appear to conform to the physical evidence. The delay did not significantly compound the effects of other police misconduct because the juveniles, except for M.E.P., confessed relatively early in their detention. A.A.D. confessed before 11:00 p.m., which was barely six hours after he was first placed in a holding cell. E.A.E. confessed when he had been detained for only about 12 of the 36 hours permissible for a juvenile detention facility (assuming the juvenile holding room that was not secure, although it appeared secure and was equipped with an alarm, could be considered a "juvenile secure detention facility" because it was inside the LEC). R.A.J. was never placed in a holding cell, or a juvenile holding room.

The trial court determined that an order finding probable cause to detain was not issued until approximately 45 hours after the initial detention. But this court must determine the effect of the illegal detention on the statements, which were made much earlier in the detention. We conclude that the delay may have compounded the effects of other alleged police misconduct but is not determinative. *See Wiberg,* 296 N.W.2d at 393 (factors to consider in determining whether statement during illegal detention should be suppressed).

▆ One of the factors in assessing the voluntariness of a confession is whether the police made any promises. *State v. Slowinski,* 450 N.W.2d 107, 112 (Minn.1990). Another factor in assessing the voluntariness of each of the juveniles' second statements is whether police used coercion or stress-inducing techniques. *See, e.g., State v. Pilcher,* 472 N.W.2d at 333.

▆ Of all the juveniles, R.A.J. made the most significant claims of improper police tactics during the second interview. The trial court in its findings appears to have credited R.A.J.'s claims that he asked to call

his mother, and that at one point he told the officers, "I'd like to try this silence thing." The police officers who questioned R.A.J. denied that he made either request.

■ The trial court acts as factfinder at a pretrial suppression hearing, deciding what testimony to believe. *See State v. Kvam*, 336 N.W.2d 525, 528 (Minn.1983). The trial court can choose to disbelieve police testimony. *See, e.g., State v. Dillon*, 308 Minn. 464, 465, 242 N.W.2d 84, 85 (1976). The trial court's order could be more explicit in rejecting the police officer testimony regarding the R.A.J. interview, but it appears, and we must assume, the trial court made that credibility determination. The failure to grant R.A.J.'s request to stop the interview weighs heavily against a finding that the statement was voluntary. *See generally State v. Jobe*, 486 N.W.2d 407, 415 (Minn.1992) (during custodial police questioning, suspect has the right to stop the questioning at any time).

There is no doubt that the second R.A.J. interview was the most stressful of the interviews that night. R.A.J. was questioned for 3½ hours, by up to three detectives, who repeatedly challenged him, accusing him of lying. The trial court found that R.A.J.'s parents had asked if they should be present during the second interrogation, and Detective Boudreau told them no. Given all of these factors, we conclude, as did the trial court, that R.A.J.'s confession was involuntary and must be suppressed.

■ E.A.E. was the third juvenile reinterviewed. This second interrogation began at 2:30 a.m. E.A.E. was brought to an interview room from the juvenile holding room where he had been kept. The trial court found that "[E.A.E.] testified the officers were 'in his face,' standing over him about a foot away and leaning over the table." The court also found that "[E.A.E.] testified" that the officers told him A.A.D. and R.A.J. were going home, and that he was going to "take the fall" for the incident. The officers denied making these statements.

■ The trial court did not explicitly resolve the conflicting accounts of the E.A.E. interview, although by citing only E.A.E.'s testimony it appeared to credit the juvenile's

testimony over that of the officers. A misrepresentation such as E.A.E. alleged concerning the status of the other juveniles does not by itself make a confession involuntary. *Moorman*, 505 N.W.2d at 600 (where additional misconduct rising to a significant level was not present, police misrepresentation did not require suppression). The physical "crowding" of the juvenile, however, combined with the lateness of the hour and the conditions of E.A.E.'s confinement (which did not allow him to sleep), provide additional coercive circumstances.

The trial court implicitly found that police deceived E.A.E. about the status of the other juveniles. The totality of these circumstances, along with the misrepresentation, make the statement involuntary. We conclude that the trial court properly suppressed E.A.E.'s second statement as involuntary.

■ M.E.P., the last juvenile reinterviewed, was being held in an adult holding cell, where he was awakened around 4:30 a.m. for his second interview. The two interrogating officers advised M.E.P. that the physical evidence did not square with his story of an accidental shooting. M.E.P., however, clung to his story. At one point, one of the officers told M.E.P. that telling the truth would be better for him.

In his tape-recorded statement, M.E.P. indicated the officer had promised him "you would help me if I told the truth." The following exchange ensued:

Q. And it will help you if you tell the truth, which this statement reflects. Is that right?

A. Yeah.

There is no evidence of a more specific promise. M.E.P. did not specify in his omnibus hearing testimony what the promise was. The trial court found the officer did tell M.E.P. that telling the truth would make him feel better. Any promise made to M.E.P. appears to have been no more specific and no more coercive than the empathetic statement that telling the truth would make him feel better.

The police officer testified that he offered M.E.P. food and drink. Although M.E.P. claimed he requested food, the trial court

made no finding on this disputed fact, finding only that M.E.P. did not eat. There is no other claim of police coercion or misconduct with respect to M.E.P. Although he had been detained the longest, and was in an adult holding cell, he had also had a chance to sleep. We conclude that the trial court clearly erred in suppressing M.E.P.'s statement as involuntary.

A.A.D., the first of the juveniles reinterviewed, had been held in an adult holding cell. A.A.D. became emotional upon being confronted with the "new evidence" and being accused of lying. But he was allowed to compose himself before police continued with the interrogation. *See State v. Pilcher,* 472 N.W.2d at 334 (emotionally distressed defendant should be allowed time to compose himself before continuing with confession). A.A.D. confessed after only 15 minutes of questioning. There is no evidence that police used coercive tactics. We conclude that the trial court clearly erred in suppressing A.A.D.'s statement as involuntary.

3. The state contends that the trial court should not have addressed the suppression issues involving A.A.D., who did not participate in the omnibus hearing due to his admission (later withdrawn) to the petition. A.A.D. argues that the state had a full opportunity to litigate the suppression issues in his case, and that judicial economy was served by deciding those issues. A.A.D. points out that the state called Detective Adrian, whose testimony related almost exclusively to the two A.A.D. interviews.

The state's argument that the issues regarding A.A.D. should not have been addressed because A.A.D. did not have the opportunity to participate is without merit. The state cannot claim prejudice from A.A.D.'s lack of opportunity to testify. The state litigated the admissibility of the four juveniles' statements as interrelated legal issues, with many facts common to each case. There was considerable testimony about the A.A.D. interviews. A.A.D. himself argues these issues were properly decided and are properly before this court. He has waived any objection to his lack of participation in the omnibus hearing.

4. The state contends that the trial court clearly erred in dismissing the petition against R.A.J. for lack of probable cause. The court found there was no admissible evidence that R.A.J. was "in or near the Blazer at the time of the incident." It is undisputed that R.A.J. had entered the Amoco station to buy the bottle of Mellow Yello. R.A.J. himself admitted in his second statement that he returned to the car before M.E.P. shot Stier. The second statements of the other juveniles, along with R.A.J.'s, described how R.A.J. was taunting M.E.P. to shoot. Because we conclude that some of these statements are admissible, we must reverse the dismissal for lack of probable cause.

Even if R.A.J. was outside the Blazer when the fatal shot was fired, there could still be probable cause to charge him as an accomplice. A person may be guilty of aiding and abetting if he or she advised or counseled another to commit the offense. *In re Welfare of J.P.L.,* 359 N.W.2d 622, 624 (Minn.App.1984). We find no support for the theory that such advice or counsel must have immediately preceded the offense.

5. The state moved to refer M.E.P. for adult prosecution under the prima facie reference statute. *See* Minn.Stat. § 260.125, subd. 3(2) (child over 16 alleged to have committed first degree murder). The trial court, however, found that M.E.P. had rebutted the prima facie case for reference. Therefore, the court addressed the reference motion under the "totality of the circumstances" test. Under this test, the state has the burden of demonstrating by clear and convincing evidence that M.E.P. is not suitable for treatment in the juvenile system or that public safety would not be served by retaining the matter in juvenile court. Minn. R.Juv.Ct. 32.05; *see In re Welfare of T.L.J.,* 495 N.W.2d 237 (Minn.App.1993). The court used the totality of the circumstances test, based on the nonexclusive list of factors set out in Minn.R.Juv.P. 32.05. *See In re Welfare of D.F.B.,* 433 N.W.2d 79, 81 (Minn. 1988).

An order regarding adult reference will not be reversed unless its findings are clearly erroneous so as to constitute an abuse of discretion. *In re Welfare of D.T.N.*, 508 N.W.2d 790, 794 (Minn.App.1993), *pet. for rev. denied* (Minn. Jan. 14, 1994). The state argues that the trial court made factual errors, that the Rule 32.05 factors favor reference, and that the trial court abused its discretion in denying the reference motion.

Dr. Carten, who was initially retained as an expert by the state and who did the reference studies on the other three juveniles, recommended against referring M.E.P. for adult prosecution. Dr. Carten diagnosed M.E.P. as chemically dependent and as having an identity disorder. He testified M.E.P. was unlikely to commit a violent act in the future and was the most remorseful juvenile he had ever seen. Dr. Carten stated that his recommendation against adult reference was the "strongest recommendation I have ever made." Dr. Gilbertson, the court-appointed expert, ultimately agreed with Dr. Carten that M.E.P. is amenable to juvenile treatment, although he expressed reservations about the time remaining to treat M.E.P. in the juvenile system, given his need to demonstrate sobriety.

The state in its brief has challenged Dr. Carten's report, and the trial court's findings, for ignoring or slighting a number of negative factors, including M.E.P.'s record of truancy, his prior aggressive behavior and his history of felony-level drug sales. The state also contends, as its expert, Dr. Philander, testified, that a majority of the Rule 32.05 factors favor reference.

Dr. Carten was extensively questioned on cross-examination about the negative factors in M.E.P.'s record. He testified he would need to see a consistent pattern of aggressive behavior before drawing any conclusions from the two fights in which M.E.P. had been involved. Dr. Carten acknowledged that selling marijuana is a felony offense, but testified that the evaluator's focus is not on whether certain behavior is antisocial but on whether the individual is antisocial. He also acknowledged that predicting violent behavior is difficult. He testified, however, that he had never had a juvenile with M.E.P.'s diagnosis (identity disorder) commit a second violent act. Dr. Gilbertson, the court-appointed expert, testified that the probability of M.E.P. engaging in another violent act was statistically remote.

The non-exclusive list of factors to be considered in reference motions is as follows:

(a) The seriousness of the offense in terms of community protection,

(b) the circumstances surrounding the offense,

(c) whether the offense was committed in an aggressive, violent, premeditated or willful manner,

(d) whether the offense was directed against persons or property, the greater weight being given to an offense against persons, especially if personal injury resulted,

(e) the reasonably foreseeable consequences of the act,

(f) the absence of adequate protective and security facilities available to the juvenile treatment system,

(g) the sophistication and maturity of the child as determined by consideration of the child's home, environmental situation, emotional attitude and pattern of living,

(h) the record and previous history of the child,

(i) whether the child acted with particular cruelty or disregard for the life or safety of another,

(j) whether the offense involved a high degree of sophistication or planning by the child, and

(k) whether there is sufficient time available before the child reaches age nineteen (19) to provide appropriate treatment and control.

Minn.R.Juv.P. 32.05, subd. 2.

Seven of these factors ((a) through (e), (i) and (j)) relate solely to the circumstances of the offense with which the juvenile is charged. As the state points out, Dr. Carten did not significantly address those factors, while Dr. Philander did, concluding that all seven favored reference. Although in this case a majority of the Rule 32.05 factors may

favor reference, that simply follows from the fact that a majority of the factors are offense-related, and that M.E.P. is charged with a very serious crime. The case law, however, does not support reference based solely on the seriousness of the offense.

■ The supreme court in *D.F.B.* reaffirmed its holding in *In re Welfare of Dahl,* 278 N.W.2d 316 (Minn.1979), that reference cannot be based solely on the juvenile's age and the seriousness of the offense.[1] *D.F.B.,* 433 N.W.2d at 81 (disagreeing with implication "that reference is justified any time a juvenile commits a heinous offense"). The court in *Dahl* held:

> The record must contain direct evidence that the juvenile endangers the public safety for the statutory reference standard to be satisfied.

*Dahl,* 278 N.W.2d at 321. What was unstated but implied in *Dahl,* and made clear in later cases, is that this "direct evidence of dangerousness" must be "in addition to the inferences which may be drawn" from the charged offense itself. *In re Welfare of K.P.H.,* 289 N.W.2d 722, 725 (Minn.1980); *see also D.T.N.,* 508 N.W.2d at 796. The state here lacks evidence of dangerousness other than the inferences to be drawn from the shooting of Marc Stier.

Dr. Philander, the state's expert at the time of the hearing, did not present any testimony, other than inferences from the offense, that M.E.P. is dangerous if not referred for adult prosecution. Dr. Carten and Dr. Gilbertson testified unequivocally that he is not dangerous.

This court has held that *Dahl,* including the requirement of "direct evidence of dangerousness," was later implicitly overruled. *In re Welfare of S.R.L.,* 400 N.W.2d 382, 384 (Minn.App.1987). More recently, however, the supreme court has reaffirmed *Dahl* in *D.F.B.,* and this court has applied the *Dahl* requirement of non-offense-related evidence of dangerousness. *D.F.B.,* 433 N.W.2d at 81;

*In re Welfare of D.T.N.,* 508 N.W.2d at 796. We conclude that under *D.F.B.,* as supported by the holding in *D.T.N., Dahl* has not been overruled and the state must present non-offense-related evidence of dangerousness in support of a reference motion.

The state cites a number of cases in which references of juveniles charged with murder or serious assault have been upheld. These cases, however, are not legally on point, involve affirmances of orders granting reference, or can be factually distinguished because there was evidence satisfying the *Dahl* requirement of non-offense-related evidence of dangerousness. *See In re Welfare of J.F.K.,* 316 N.W.2d 563, 564 (Minn.1982) (affirming reference of juvenile charged with second degree murder); *In re Welfare of Givens,* 307 N.W.2d 489, 490 (Minn.1981) (affirming reference where prima facie case was unrebutted); *In re Welfare of S.E.M.,* 421 N.W.2d 369, 371 (Minn.App.1988) (affirming reference order without discussing non-offense-related evidence of dangerousness that did exist in the case); *In re Welfare of J.A.R.,* 408 N.W.2d 692, 695 (Minn.App.1987) (affirming reference order where there was non-offense-related evidence of juvenile's "numerous instances of acting out violently" against others), *pet. for rev. denied,* (Minn. Aug. 26, 1987). In this case the state is urging the reversal of a refusal to order reference.

The supreme court in *D.F.B.* reversed a refusal to refer a juvenile. The supreme court in *D.F.B.* noted that the court-appointed psychiatrist had "serious reservations" about the juvenile court system's ability to effectively treat D.F.B. *Id.* at 80. Here, Dr. Gilbertson expressed only a reservation that M.E.P. may not be able to complete a year of drug abstinence before turning 19. Given the expert testimony that chemical dependency is a lifelong commitment, this reservation is not comparable to that expressed in *D.F.B.* Moreover, one expert in *D.F.B.* acknowledged that treatment for severe de-

---

1. The 1994 Juvenile Justice Reform Act extends juvenile court jurisdiction in some cases to the juvenile's 21st birthday. 1994 Minn.Laws ch. 576, §§ 14, 25. That provision, however, is not effective until January 1, 1995. *Id.* at § 68. The new law establishes a presumption of certifica- tion in some cases based on age and the seriousness of the offense. *Id.* at § 13. The law also changes the factors governing certification and allows the court to extend juvenile jurisdiction for certain offenses, including those involving a firearm. *Id.* at § 14.

pression (the juvenile's diagnosis) is often unsuccessful. *Id.* Here there is no significant dispute that M.E.P.'s condition is treatable or that there are appropriate treatment programs that would accept him.

We conclude that the trial court's order denying the motion to refer M.E.P. is not clearly erroneous so as to constitute an abuse of discretion. *See generally In re Welfare of M.J.B.*, 509 N.W.2d 920, 922 (Minn.App. 1993), *pet. for rev. denied* (Minn. Feb. 24, 1994).

## DECISION

The trial court did not clearly err in determining that the initial statements of three of the juveniles were taken in violation of *Miranda* and should be suppressed. The trial court did not clearly err in suppressing as involuntary the later statements of R.A.J. and E.A.E. The later statements of M.E.P. and A.A.D. were voluntary, however, and should not have been suppressed. The trial court also erred in dismissing the petition against R.A.J. for lack of probable cause. Finally, the court did not abuse its discretion in denying the motion to refer M.E.P. for adult prosecution.

**Affirmed in part, reversed in part, and remanded.**